THE STATE ex rel. BELT v. CITY OF ST. LOUIS et al.

### In Banc, March 26, 1901.

1. **St. Louis: PUBLIC WORKS: VALIDITY OF ORDINANCE.** The charter of St. Louis provides that the assembly shall have no power directly to contract for any public work or improvement, but that the board of public improvements shall in all cases, prepare and submit to the assembly estimates of costs of any proposed work, and under the direction of the ordinance advertise for bids, etc., and shall let out said work by contract to the lowest responsible bidder, subject

State ex rel. v. City of St. Louis.

to the approval of the council, and it also provides that the board
of public improvements shall recommend to the assembly ordinances.
for the repairing and cleaning of all streets and alleys, and that
no ordinance therefor shall be passed without such recommendation.
*Held,* that these parts of the charter apply to ordinances which do
not require a specific appropriation from the city treasury, as well
as to such as do, and that, another section of the charter which
states that "every ordinance requiring such work to be done shall
contain a specific appropriation from the revenue fund," does not
permit the assembly to thus directly contract with a person for
cleaning the street, but is, in fact, another limitation upon the
power of the assembly. *Held,* therefore, that an ordinance, passed
by the municipal assembly without any such recommendation from
the board of public improvements which authorized and directed said
board to enter into contract with relator for cleaning the streets
of "waste paper and other litter," and to provide boxes at suitable
places for the collection of said paper, and to give relator exclusive
right to use said boxes for advertising purposes for ten years, with-
out cost or expense to the city, is invalid.

   *Held,* by MARSHALL, J., in a dissenting opinion, that the ordinance
      in this case does not involve a public work, but simply a public
      use of the street, which the assembly, by the charter, has the
      right to regulate without the intervention of the board of public
      improvements. In said opinion the difference between a public
      work and a public use is elaborately discussed, and said ordi-
      nance is held to be valid.

2. ———: DEVOTING STREETS TO PRIVATE BUSINESS. A city has no
   power, by ordinance or otherwise, to subject the public streets to a
   purely private business; for instance, by farming out its streets
   and alleys, or any part of them, to a private person, to be used by
   him in advertising the individual businesses of other private persons,
   by authorizing him to place boxes on the streets for the reception
   of waste paper, and to collect money for advertisements posted on
   such boxes. It can only permit the streets to be used for a public
   use.

   *Held,* by MARSHALL, J., that the fact that the city gets a part of
      the proceeds arising from advertisements on such boxes does not
      even tend to determine whether the receptacles are or are not
      public utilities which make the use of the streets public or pri-
      vate, but the test is, does the use subserve a public purpose?
      And the purpose of this ordinance being to prevent the streets
      from being littered, by affording storekeepers and the general

State ex rel. v. City of St. Louis.

public a convenient and suitable place to deposit waste paper and other litter, thereby saving the city from the expense of cleaning the street, the use is a public one, and the ordinance is valid.

4. ———: ———: MANDAMUS. Even though the charter permitted such ordinance to be passed by the assembly, the courts would not compel, by the writ of mandamus, the board of public improvements to contract with the relator for the boxes, for the relative duties of the board and relator are not set out in the ordinance, and no restrictions upon the power of the board from contracting for boxes of such a size as to be a nuisance, are therein provided for. The writ of mandamus can not be used to subserve such a purpose.

5. Ordinance: EXCLUSIVE PRIVILEGE: TITLE. The body of an ordinance may show its object is to grant an exclusive privilege to a private person to conduct a private business in a street, while this purpose may not be expressly revealed by any word in the act or its title.

*Mandamus.*

ALTERNATIVE WRIT QUASHED.

*G. B. Webster* for relator.

*Herman A. Haeussler, Arthur B. Shepley* and *Charles S. Reber* for respondents.

(1) The ordinance in controversy is invalid because it requires the board of public improvements to make a contract with relator which involves public work. Sec. 27, art. 6, charter of St. Louis; State ex rel. v. Barlow, 48 Mo. 16; Cole v. Shrainka, 37 Mo. App. 427, 433. (2) Said ordinance is invalid because it undertakes to grant to relator the right to use the streets for a private purpose. Matthews v. Alexander, 68 Mo. 115; Glasgow v. St. Louis, 87 Mo. 678; Cummings v. St. Louis, 90 Mo. 259; Glaessner v. Brewing Association, 100 Mo. 508; Scopp v. St. Louis, 137 Mo. 537; Coal Company v. Coal Company, 62 Mo. App. 93. (3) Said ordinance is void because it contains more than one subject. Sec. 13, art 3, char-

ter of St. Louis; State v. Lafayette County, 41 Mo. 39; State v. Persinger, 70 Mo. 346; City of Kansas v. Payne, 71 Mo. 162; State v. Jackson County, 102 Mo. 531; State v. County Court, 128 Mo. 441; Wittman v. Railroad, 131 Mo. 612; State v. Heege, 135 Mo. 112.

GANTT, J.—This is an original proceeding of mandamus instituted in this court to compel the board of public improvements of the city of St. Louis to enter into a contract with relator for the erection and maintenance, for ten years, of boxes to be placed in the streets of said city, to be used by relator for advertising purposes, and by the city of St. Louis for the purpose of holding any waste paper that might be thrown on said streets.  On the return of the writ respondents, city of St. Louis and Emory S. Foster, filed returns, alleging, among other matters, that they were not proper parties to the suit.  On the same day the remaining respondents, the board of public improvements of St. Louis, filed a motion to quash the alternative writ for the reason that relator's petition failed to state facts which entitled him to any relief, thus raising at once the question as to the validity of the ordinance set forth in his petition.

The ordinance, which relator claims imposes a plain, legal duty on said board, which duty it has refused to perform, is as follows:

### "19984.

"An ordinance authorizing, directing and empowering the board of public improvements of the city of St. Louis to erect and maintain, at convenient and suitable locations upon the streets and public places of said city, boxes or receptacles for the collection, casting and temporary deposit therein of such waste paper or other litter as now are or are likely to be cast upon said streets or public places, and to contract with Fred R. Belt, or-

his assigns, to erect and maintain said boxes or receptacles, for the purpose aforesaid, without cost or expense to the city.

"Be it ordained by the municipal assembly of the city of St. Louis, as follows:

"Section 1.    The board of public improvements of the city of St. Louis is hereby authorized, directed and empowered to erect and maintain, at such convenient and suitable locations, upon the streets and public places of said city, as may, from time to time, be designated by said board, suitable boxes or receptacles for the collection, casting and temporary deposit of such waste paper or other litter as now are or are likely to be cast upon the streets or public places of said city, and to provide and arrange for the cleaning and keeping clean of such boxes and receptacles, and the removal of such waste paper and other litter, and to accomplish the purposes aforesaid, said board of public improvements is hereby authorized, directed and empowered to enter into a contract with Fred R. Belt, or his assigns, for the exclusive right of said Belt, or his assigns, to erect and maintain, at such convenient and suitable locations upon the streets and public places of said city as may be designated from time to time by said board, suitable boxes or receptacles for the collection, casting and temporary deposit therein of such waste paper or other litter as now are or are likely to be cast upon the streets or public places of said city, and to provide and arrange with said Belt, or his assigns, for the cleaning and keeping clean of such boxes or receptacles, and the removal of such waste paper or other litter.

"Sec. 2.    The contract with said Belt or his assigns, is to be made for and during the full term of ten years, from and after the execution of the contract.

"Sec. 3.    It shall be specified in said contract with said Belt, or his assigns, that the said Belt or his assigns, during the term aforesaid, shall erect, renew and maintain said boxes or

receptacles at all such locations upon any of the streets and public places of said city, as may, from time to time, be designated by said board of public improvements, without cost to said city for the erection or maintenance of said boxes or receptacles, or for keeping said boxes and receptacles clean.

"Sec. 4. That for and in consideration and as full compensation to said Belt, or his assigns, for erecting, maintaining and keeping clean all said boxes or receptacles, said Belt, or assigns, are to have and possess all waste paper and other litter cast and deposited in said boxes or receptacles, and are also to have the exclusive right and privilege to place advertisements on such boxes or receptacles, for the benefit of himself or assigns; provided, however, that no advertisement which is of an immoral or disreputable character shall be placed thereon; and provided that all advertising signs shall be made of tin or other metal, and no bill or advertisement on paper is to be posted upon said boxes or receptacles; and provided, further that no advertisement of any kind shall be placed on any of said boxes or receptacles until the same shall have first been submitted to and approved by the board of public improvements of said city.

"Sec. 5. In consideration of the granting of the privileges aforesaid to said Belt, or his assigns, said Belt, for himself and his assigns, agrees, during the continuance of the contract provided for as aforesaid, to submit a quarterly statement to the register of the city of St. Louis, showing the amount collected in each quarter for the advertisements placed on said boxes or receptacles, and to pay into the city treasury of the city of St. Louis, at the end of each quarter, fifteen per cent of the gross receipts received by the said Fred R. Belt or his assigns, during the lifetime of the franchise granted by this ordinance.

"Sec. 6. Said Fred R. Belt, or his assigns shall, in connection with said contract, give his or their bond in the penal sum of five thousand dollars, with two or more sureties, to be

approved by the mayor and council, conditioned for the observance of all said terms, provisions and conditions, and for the prompt submission of said quarterly statement, and the prompt payment of all sums of money herein by him and his assigns agreed to be paid.

"Sec. 7.    Where a remonstrance is filed by a majority of the residents of any block or blocks in the city against the erection of any box or boxes, as described in this ordinance, then it shall be unlawful to place said box or boxes, on said block or blocks.

"Sec. 8.    If said Fred R. Belt, or his assigns, shall fail to make true and correct returns of receipts as aforesaid, or shall fail to keep said boxes in a sanitary condition to the satisfaction of the street commissioner, or shall fail to clean out said boxes daily, he shall forfeit all rights granted herein.

"Approved March 19, 1900."

I.    The validity of the ordinance requiring the board of public improvements to enter into the contract, with relator, Belt, for the exclusive right to erect and maintain boxes, to be placed upon the streets and public places of St. Louis for the collection and temporary deposit of waste paper and other litter, must be determined by the charter of St. Louis.

So much of section 27 of article 6 of the charter as is pertinent to this inquiry, is in these words:

"The assembly shall have no power directly to contract for any public work or improvement, or repairs thereof, contemplated by this charter, or to fix the price or rate therefor; but the board of public improvements shall, in all cases, except in case of necessary repairs requiring prompt attention, prepare and submit to the assembly estimates of cost of any proposed work, and, under the direction of the ordinance, shall advertise for bids as provided for purchases by the commissioner of supplies, and let out said work by contract to the lowest responsi-

ble bidder, subject to the approval of the council. Any other mode of letting out work shall be held as illegal and void."

This article of the charter had been considered by the St. Louis Court of Appeals in Cole v. Skrainka, 37 Mo. App. 427, in an opinion by Judge ROMBAUER, in which he says: "The board of public improvements of the city of St. Louis are the agents of the city in regard to all street improvements. All ordinances for such purposes must emanate from the board. [R. S. 1879, p. 1608, secs. 14, 15, and 16.] The assembly had no power to contract either directly or indirectly for any public work. [Sec. 27, p. 1610, R. S. 1879.] The ordinances are all framed by the board . . . It is an initial and necessary step of the contract," etc.

Judge BOND dissented upon another point, and that case came to this court and the opinion of Judge ROMBAUER was affirmed. [Cole v. Skrainka, 105 Mo. 303; Verdin v. St. Louis, 131 Mo. 26.]

In City of St. Louis v. Gleason, 89 Mo. 67, a condemnation proceeding under a charter provision akin to this, came before this court and the counsel for the property-owners insisted that the judgment must be reversed because "the ordinance failed to show that it was passed upon the unanimous recommendation of the board of public improvements, or on the petition of the owners of the major part of the property fronting on the proposed street." Citing article 6, section 2, of the St. Louis charter. This court unanimously ruled that the municipal assembly had no power to act, no jurisdiction over the subject-matter until directed by the board of public improvements or the owners of a major portion of the ground fronting on the proposed street. "Until such action was taken by the board of public works or the owners of the ground, there was no authority in the assembly to pass the ordinance."

By section 7 of the same article 6, it is provided that

"the board of public improvements shall recommend to the assembly ordinances for the repairing and *cleaning of all streets, alleys* and highways, and for the construction of crosswalks, and *no ordinance therefor* shall be passed without such recommendations."

With this understanding, then, of the charter and the construction placed upon it by the courts, let us inquire, first, what is the purpose of the ordinance, No. 19984? Clearly it is two-fold: to clean the streets of "waste paper or other litter," and to give Belt the exclusive right to use the boxes for advertising purposes for ten years.

The ordinance was not recommended by the board of public improvements and they deny the power of the assembly to pass and enforce it. If the ordinance provides for public work within the meaning of the charter, it must be held void. The cleaning of a public street is so obviously a public work that it requires no argument to make it more so. Unless the purpose was to rid the streets of an unseemly appearance by removing the loose paper and litter, no reason can be perceived why the assembly should have entertained the matter at all. If such was the purpose of the ordinance it involved a public duty and a public work, which the assembly sought to cast upon a public body, the board of public improvements. If the ordinance was not enacted to subserve a public purpose, the assembly had no power or authority to impose the duty it did on the board of public improvements, whose functions are public. But as the charter required the board to recommend the ordinance, and prohibited the passage of an ordinance without its recommendation in the first instance, the ordinance was invalid for this, if for no other reason.

Counsel for relator, however, insists that the assembly is forbidden to contract for public work only when the work is to be paid for out of the city treasury, because section 28 of

article 6 provides that "every ordinance requiring such work to be done shall contain a specific appropriation from the revenue fund," and as this ordinance does not contemplate the expenditure of public funds, section 17 and 27 of article 6, do not apply to the ordinance in question.

We do not so construe section 28 of article 6. In our opinion, it was simply another limitation upon the assembly, and not upon section 27. Section 27 expressly prohibits the assembly from directly contracting for "any public work contemplated by this charter," which necessarily includes the street cleaning mentioned in section 17.

The purpose of the freeholders in thus restricting the assembly is manifest and two-fold. They sought to create a board whose experience and ability would especially fit it for the duty of contracting for a vast system of public improvements and whose estimates should guide the assembly in entering upon them, and secondly, to guard against extravagance by requiring that before public work was ordered to be done, there should be expert estimates made thereof.

The argument of counsel for relator is strikingly similar to that of counsel in State ex rel. Dunn v. Barlow, 48 Mo. 17. In that case a contract had been awarded to one Henry for lighting, cleaning and repairing the street lamps of St. Louis for one year. It was assigned to Dunn with the consent of the city and extended from year to year. At the time the contract was awarded, the charter did not require public work to be let to the lowest bidder, but prior to the last renewal the charter was so amended. After the amendment the city entered into a new contract with one Zeider, and the comptroller having signed Zeider's contract refused to countersign Dunn's extension. Thereupon, Dunn brought a proceeding for mandamus in this court to compel the comptroller to countersign his contract. It was admitted there, as it must be here, that

if Dunn's contract was for public work, it violated the amended charter.

But it was insisted then, as it is now, by relator, that the charter did not apply to that particular contract. The argument is reported thus:

"The meaning of section 17, article 8, amended charter, approved March 4, 1870, is obvious: 1. The council shall not contract directly, but may contract indirectly, for work indicated in that section, after plans, profiles, estimates, advertisements and bids approved by the council. 2. But no work, improvement or repairs mentioned in that section is to be let out after advertisements and bids unless it be of nature to admit of plans, profiles and estimates of costs. That is perfectly clear. Section 18 enforces the same view wherein it says every ordinance requiring such work shall contain a specific appropriation from the proper revenue or fund, based on an estimate of cost. Now what is meant by such work? Evidently that of which profiles and plans may be made and submitted."

This is precisely the same argument that is now made. Section 18 of the amendment of 1870 (now section 28) provides that every ordinance involving *such work* shall make an appropriation therefor, and requires plans and specifications to be prepared and an estimate of the cost made. It was argued in that case that the contract did not contemplate public work because the work to be done did not admit of plans and specifications, and that by section 18 only work that did so admit was public work. Here, it is said that the contract does not involve public work because the ordinance requiring it to be done does not contain an appropriation therefor, and that only work to be done under an ordinance so requiring, is public work under the charter.

This court rejected the argument in Dunn's case and held

that, although that particular contract did not call for "plans, profiles, and estimates of cost," *the spirit* of the ordinance and the amended charter required specifications and competitive bids and denied the assembly or city council the power to contract directly for such work.

Counsel cite State ex rel. v. St. Louis, 56 Mo. 277, but very candidly admit it is open to criticism, because it was ruled that the ordinance and amended charter required the city engineer to make the plans and estimates and let to the lowest bidder only when the work was to be done by the city and paid out of the city treasury, and did not require such plans, specifications and estimates and competitive bidding when the work was done by ordinance and contract of the city to be paid by property-holders.

This distinction, if it can be so denominated, condemns the whole decision. In either case it was clearly public work, and if the principle of competitive bidding should ever be applied and enforced it is when the city makes public improvements at the expense of the owners of private property.

So in this case, this provision of the charter in section 27, one of the most admirable and salutary in the charter, applies in full force. The cleaning of the streets had been especially confided to the board of public improvements. If deemed advisable to have boxes or receptacles for waste paper or litter, it was eminently proper that the board should specify the character, size and material out of which they should be made, and an estimate of the number to be required, and the contract should be let to the lowest bidder, and without these essential prerequisites no valid ordinance could be passed.

But there is another view to be taken of this ordinance. It subjects the public streets to a purely private purpose, to-wit, the advertising of individual business and enterprises. Can the city devote its streets to such a purpose? We hold that

it can not.   The charter gives the city power "to regulate the use of the streets."   Under this grant it may, it is true, not only regulate the travel thereon, but it may allow gas, water and sewer pipes to be laid therein and permit telegraph and telephone poles to be erected therein, because all of these uses are consistent with the use for which they are dedicated or condemned.   [Schopp v. City of St. Louis, 117 Mo. 136.]

But it has been held by this court that the city has no power to lease out portions of the street for huckster stands and stalls.   "The public highways belong from side to side and end to. end, to the public, and 'the public are entitled, not only to a free passage along the highway but to a free passage along any portion of it not in the actual use of some other traveler,' and the abutting property-owner has the right to the free and unobstructed passage to and from his property." [Schopp v. St. Louis, 117 Mo. 136-7; Sherlock v. Kansas City Belt Line, 142 Mo. 172; Knapp, Stout & Co. v. Railroad, 126 Mo. 26; Schulenburg v. Railroad, 129 Mo. 455.]

And it was held in Glaessner v. Brewing Co., 100 Mo. 508, that a franchise to lay a railroad track in a street must be for a public and not for private purposes.   Referring now to the ordinance, it will be observed that it confers upon Belt the exclusive right to place *advertisements on* such boxes, for the benefit of himself and his assigns.   In a word, the city has attempted to farm out its sidewalks and streets to a private person for advertising.   Belt is free to make his own charges for advertising; no power is reserved to the city, even if it were a purpose to which it could devote the streets, to regulate the charges for advertisements.

The legislative authority of the city could not thus be delegated, nor could it abdicate its control over the public streets, held by it in trust for the public, and create a monopoly in favor of one advertiser.   [Matthews v. Alexandria, 68 Mo.

115; Cooley on Const. Lim. (6 Ed.), 247-253; Gale v. Kalamazoo, 23 Mich. 344; Oakland v. Carpentier, 13 Cal. 540.]

But it is said that it is no objection to a public franchise that its owner may derive a private gain therefrom. This is unquestionably true when the use is public and the gain arises out of that use, such as street cars, telegraph and telephone lines. In this case, however, the pecuniary profits to Belt arise from a source wholly distinct from any public use. They will not flow naturally from his right to erect and maintain boxes for waste paper, but solely from a distinct privilege in which the public are not interested, to-wit, his exclusive right to use the streets for advertising purposes, a purely private and collateral enterprise.

We are clear that the streets can not be devoted to such a private purpose.

With what sort of propriety or fairness can the city farm out to Belt and his assigns the right to erect a box on a sidewalk, in front of a business house and not only thus deprive the proprietor, who has been compelled to construct the sidewalk and pay for improving the street in front of his premises, of the free access, ingress and egress from his store, but to advertise the goods of a rival in the same line of business?

The question furnishes its own answer. The city had no such power.

We have considered the two paramount purposes of this ordinance separately, and our conclusion is that the cleaning of the streets is a public duty required to be accomplished by public work and the charter negatives the power of the assembly to directly contract therefor, but it must be first recommended by the board as required by the charter.

Second, the city has no power to let out the sidewalks and streets to a private person for advertising purposes, even though he should pay it a per cent of the property, and the combining

of these two illegal purposes in one ordinance does not make it valid.

The Julia Building case, 88 Mo. 258, State ex rel. v. Schweickhardt, 109 Mo. 496, and the Subway case, 145 Mo. 551, have no bearing on the questions here decided.

The Julia Building case and the Subway case were put upon the distinct ground that they were public uses, and the Schweickhardt case involved only the validity of an ordinance granting him the privilege of selling refreshments in Forest Park. This court held that a park was a place devoted to amusement, comfort, and recreation of the public; that the power to regulate parks included the power to make all reasonable regulations to promote such objects.

II.   This is a proceeding for a writ of mandamus to compel the board of public improvements to make a contract with Belt for the erection of boxes or receptacles in which to put waste paper and other litter on the streets.

The relative duties of the board and Belt are not defined in the ordinance save as to certain restrictions, but as the board have been denied their charter privilege and duty of making the necessary specifications and estimates, how can this court proceed to make the contract for the parties by commanding the board to contract for a certain number of boxes of a certain dimension and of certain material. Suppose Mr. Belt desires the boxes large enough to properly advertise a circus and the board should think such boxes would constitute an unsightly obstruction of the sidewalk, amounting to a nuisance to the merchant who does business in the abutting building, are we to determine it by our peremptory writ ?

We do not think the writ can be used to subserve such a purpose.

III.   It remains only to consider the further contention

Vol 161 mo—25

State ex rel. v. City of St. Louis.

that this is clearly a franchise legislation, and as thus construcd it is not obnoxious the objection that it attempts to grant a monopoly of the advertising business in the streets of St. Louis, or that it is a grant of an exclusive privilege.

While its purpose was obviously to grant an exclusive privilege, and without this privilege the contract would be wholly undesirable and profitless, no intimation that such was its purpose is disclosed in its title, and it falls within the rule laid down by this court in Kansas City v. Payne, 71 Mo. 162, wherein it was aptly said, "The body of the bill expresses its object; the title disguises and conceals it."

The city was, moreover, without authority, as already said, to grant such a franchise.

The alternative writ must be held to have been improvidently granted, and it is therefore ordered quashed and the proceeding dismissed at the cost of relator.

*Burgess, C. J., Robinson, Brace* and *Valliant, JJ.,* concur, *Sherwood* and *Marshall, JJ.,* dissent.

## DISSENTING OPINION.

MARSHALL, J.—This is an original proceeding by mandamus to compel the board of public improvements of St. Louis to enter into a contract with relator pursuant to the provisions of an ordinance of the city numbered 19,984. That ordinance, briefly stated, authorizes and directs the board of public improvements to erect and maintain, at such convenient and suitable locations upon the streets as the board may designate, suitable boxes or receptacles for the collection and temporary depositing of such waste paper or other litter as is or is likely to be cast upon the streets, and to provide for keeping such boxes clean, and for the removal of such deposits, and to accomplish the purpose intended, the ordinance directs the board to enter into

a contract for ten years with relator, to erect, maintain and keep clean such boxes, and to remove such litter at the relator's expense and without cost to the city at all.

The consideration to the relator for such work, labor and expense, is that he shall have the right to place on such boxes such advertisements, made of tin or other metal, as might be approved by the board of public improvements, but not such as are of an immoral or disreputable character.    The ordinance required relator to make quarterly statements of the amount he receives from such advertisements and to pay the city fifteen per cent of such gross receipts.    The ordinance prohibits the erection of such boxes on any block or blocks if a majority of the residents of the block remonstrate against it.    It also provides that the relator shall give a five thousand dollar bond to secure performance of the contract on his part, and for a forfeiture of his rights if he fails to make true and correct returns of receipts, or fails to keep the boxes in a sanitary condition, or fails to remove such deposits from such boxes daily.

The defendants set up three grounds for refusing to enter into such a contract; first, that the ordinance is void because it requires the board of public improvements to make a contract with relator which involves public work; second, that the ordinance is void because it undertakes to grant to relator the right to use the streets for a private purpose; and third, that the ordinance is void because it contains more than one subject.

Every one will, at once, concede that if all or any of these objections is well taken, the ordinance is void.

If the ordinance involves any public work or improvement or repairs thereof, it is void, for section 27 of article 6 of the city charter expressly prohibits the municipal assembly from directly contracting for such matters or from fixing the price or rate therefor, and requires the board of public improvements, in all cases (except in case of necessary repairs requir-

ing prompt attention) to prepare and submit to the assembly estimates of the cost of any proposed work, and, under the direction of the ordinance, to advertise for bids and let out such work by contract to the lowest responsible bidder, subject to the approval of the council, and makes any other mode of letting out work illegal and void.   Section 14 of article 6 prohibits the assembly from passing any ordinance for the construction or reconstruction of any street, alley or public highway unless such ordinance is recommended by the board of public improvements.   Section 15, article 6, provides that:  "All ordinances recommended by said board shall specify the character of the work, its extent, the material to be used, the manner and general regulations under which it shall be executed, and the fund out of which it shall be paid, and shall be indorsed with the estimate of the cost thereof," etc.

Section 17, article 6, provides:  "The board of public improvements shall recommend to the assembly ordinances for the repairing and cleaning of all streets and highways, and, for the construction of crosswalks, and no ordinance therefor shall be passed without such recommendations."

From these charter provisions it is clear that the assembly has no power to pass any ordinance for the doing of any public work or making any improvement or repairs thereof or for cleaning streets or constructing sidewalks, unless the ordinance is recommended by the board of public improvements. The reason for all which is manifest, not only from the charter of the city, but also from the history of the evolution of that charter, and of similar provisions in the charters of other cities.

The board of public improvements is composed of persons specially selected because of their ability and skill to deal with such questions.   The members of the assembly are not required to possess and do not generally possess such ability

or skill.   There are many features of protection preserved to the citizen before even the board of public improvements can recommend such ordinances.   There must be notice and public hearings, opportunity to consent or object, given to the citizen before even the board can act.   So, while the board is a check upon the assembly, the people themselves are a check upon the board.   These provisions are wise and salutary.   They afford the greatest opportunity of ascertaining, regarding and protecting the rights of the people, and are safeguards against improper or jobbing contracts.

It may be broadly and emphatically stated, therefore, that no contract for any kind, character or species of public work or improvements or repairs thereof or for cleaning streets, is valid unless the ordinance authorizing it is recommended by the board of public improvements, after it has faithfully complied with all charter prerequisites to its action.   This proposition can not be stated too strongly or unequivocally.

If, therefore, the ordinance before the court in this case contemplates, involves or provides for the doing of any public work or the making of any public improvement, or the cleaning of the streets, it falls within the condemnation of the rule announced and is void.

The crucial question, therefore, is, does the erection, maintenance and keeping clean boxes in which waste paper and litter may be deposited, fall within the terms "public work, improvements or street cleaning," as these words are used in the charter?

The case of Cole v. Skrainka, 37 Mo. App. 427, and St. Louis v. Gleason, 89 Mo. 67, throw no light on the inquiry, for the ordinances questioned in both of those cases were recommended by the board of public improvements, and the attack was upon the alleged failure of the board to obey the charter requirements as to its proceedings, and hence they did not

involve the right of the assembly to pass an ordinance unless it was recommended by the board. The ordinance in the Cole case was for the reconstruction of a street, which is clearly public work or improvement; and the ordinance in the Gleason case was for the establishment of Benton street, which is clearly a public improvement, and such an ordinance is expressly required by section 2 of article 6 to be recommended by the board of public improvements.

The case of State ex rel. Dunn v. Barlow, 48 Mo. 17, involved this question: Dunn had a contract with the city to light, clean and keep in repair the street lamps, which had been made by the city engineer and extended from time to time, and which was perfectly legal when made. The charter of the city was amended by the Act of March 4, 1870, and it was then provided, for the first time, that the city council should have no power directly to contract for any public work or improvements, or repairs thereof, nor to fix the price or rate therefor, but that the city engineer should in all cases, except in cases of necessary repairs, prepare and submit to the council, plans, profiles and estimates of cost of any proposed work, and under the direction of ordinance should advertise for bids and let out the work by contract to the lowest and best bidder, subject to the approval of the council. It will be observed that this provision is substantially the same as section 27 of article 6 of the present charter, except that the board of public improvements takes the place of the city engineer. After the act went into effect the city contracted in the manner provided by the charter, with one Zider to light, clean and repair the street lamps. Thereupon, Dunn brought mandamus, to compel the city comptroller to approve an extension of his contract made by the city engineer on the third of January, 1871, for a year ending March 1, 1872. It was held that the amended charter superseded the ordinance regulation in force when the charter

was enacted, and that the power given the city engineer by the ordinance to make such a contract was *ipso facto* taken away by the amendment to the charter. There can be no doubt that the lighting, cleaning and repairing of the street lamps is public work within the meaning of that term as used in the charter of 1870, and in the present charter of St. Louis, and hence the municipal assembly did not then have and has not now the power to directly contract therefor.

These are all the cases that have been cited to show that the ordinance in question relates to public work, and it is too plain to admit of debate that they do not determine or solve or settle the question involved. This leaves this case without direct, controlling or binding precedent in the decisions of the courts of this State. In fact, no case from this or any other jurisdiction has been cited which attempts to define whether placing such boxes for such purpose on the streets constitutes public work or improvements or not. The solution of the problem must, therefore, be found in fundamental principles or be reasoned out by analogy.

In considering the meaning of the terms, "public works" and "improvements," used in section 27 of article 6, the provisions of paragraph 2, section 26, article 3, of the city charter, must also be borne in mind. Those provisions are: "The mayor and assembly shall have the power within the city, by ordinance not inconsistent with the Constitution or any law of this State, or of this charter * * * * to establish, open, vacate, alter, widen, extend, pave or otherwise *improve* and sprinkle all streets, avenues; * * * * to construct and keep in repair all bridges, streets, sewers and drains, *and to regulate the use thereof.*"

Section 27 of article 6 and section 26 of article 3 are *in pari materia,* and must be construed together and full force given to every part of each, if possible. It will thus be seen

that if the purpose of an ordinance relates to public work or improvements, the assembly can not, under section 27 of article 6, legally pass the ordinance, unless it is recommended by the board of public improvements, and the work must be let by competitive bidding, to the lowest responsible bidder, whereas, if the ordinance simply regulates a particular use of a street, the municipal assembly has full and sole power to deal with the matter, under section 26 of article 3, and the board of public improvements has nothing to do with it. The plain reason is that the board is constituted of experts as to the question of "the character of public work and improvements, its extent, the material to be used, the manner and the general regulations under which it shall be executed," but the assembly is just as qualified as the board to properly and intelligently regulate the use of the streets. In other words, because of their special education and training, the board is given the power to determine, in the first place, the manner, method, character, extent and plans to be observed in creating, doing or making public work or improvements (in this case a street), but the assembly is authorized by the charter to regulate the use of the street after it is improved. The board deals in engineering or building problems, while the assembly deals with governmental questions or questions of proprietorship. An architect is better qualified to judge of the construction of a house than the owner, but the owner is probably better qualified than the architect to judge of the business question of what use the house shall be applied to after it is constructed.

There is a practical, common sense and generally accepted difference in meaning between a public improvement and a public use of a public improvement. This difference is recognized in section 26 of article 3, for the mayor and assembly are given power by ordinance, not inconsistent with the other provisions of the charter, to *improve,* construct and keep in

repair all streets and *to regulate the use thereof.* Thereby, plainly contemplating that if the street is to be improved or constructed or repaired, the provisions of section 27 of article 6 apply, and an ordinance therefor can only be passed when recommended by the board of public improvements, and the work thereby authorized can only be done by contract, let by competitive bidding, but if the ordinance is simply to regulate the use of the street after it is improved or constructed, the assembly alone has power to deal with the question. This distinction is made more apparent if the ordinance should relate to the use of an *unimproved* street, for in such cases no engineering or expert skill is needed, and the question is purely a governmental or business one, as to whether the use is a proper one.

There is, also, in law and in common sense, a well defined difference between a public improvement and a public utility.

Constructing or improving a street, an alley, or wharf, a sewer, a drain, a public highway of any kind, waterworks, gas works, and other like matters, constitute a public improvement, and all work done in relation to repairing, lighting and cleaning streets is public work. Ordinances relating to such matters can only be passed upon the recommendation of the board of public improvements. But among the public utilities which the assembly may, without the recommendation of the board of public improvements, permit the street to be used for, may be mentioned, as illustrations merely, street cars, telegraph, telephone, electric light, heat and power poles and wires, gas pipes, water pipes, subways, overhead or underground street car wires, and the like. [2 Dillon on Mun. Corp. (4 Ed.), sec. 680, et seq.] In short, as is well stated by Judge DILLON (2 Dill. Mun. Corp., sec. 703, note 1, p. 844), "In the absence of special constitutional restrictions, and where property rights are not invaded, the power of the Legislature over all streets

and highways and public places, and their *uses,* is plenary."
And the same learned author, section 688, says: "The power
of the public, *or of the municipal authorities representing by
delegated authority the public"* (as shown above, this power
is expressly delegated to the assembly of St. Louis by section
26 of article 3), "over streets, is not confined to their use for
the sole purpose of travel, but they may be used for many other
purposes required by the public convenience. *The uses to
which streets in towns and cities may legitimately be put* are
greater and more numerous than with respect to ordinary roads
or highways in the country. With reference to the latter, all
the public requires is the easement of passage and its inci-
dents; and hence the owner of the soil parts with this use only,
retaining the soil, and, by virtue of this ownership, is entitled,
except for purposes for repairs, to the earth, timber, and grass
growing thereon, and to all minerals, quarries and springs be-
low the surface; and he may maintain actions against those who
obstruct the road or interfere with his rights therein. But
with respect *to streets in populous places* the public conveni-
ence requires more than the mere right to pass over and upon
them." Illustrating the difference of the uses which a city
may authorize of its streets, the author devotes seventy-six pages
(pp. 817 to 894) to the enumeration of uses which has been
held legal and proper, all of which falls within the term, public
utilities, and not one of which can be classified as public work
or improvements. It is true that in some degree every im-
provement is a public utility and likewise every utility is a
public improvement. Among lexicographers a distinction is
made between a public improvement and a public utility, and by
some a public utility is distinguished from a public use, and it
is said, "Utility is somewhat more abstract and philosophical
than usefulness or use, and it is often employed to denote adap-
tation to produce a valuable result, while usefulness denotes

the actual production of such result,." [Standard Diction-
ary, title, Utility.] But no layman, lexicographer or lawyer
has ever failed to mark the difference between an improve-
ment and a use of a street, and the instances above cited clearly
define that difference to the judicial mind.

It is manifest that this ordinance does not rest upon the
power or duty to clean the streets, and if it did it would be
void under section 17 of article 6 of the charter, because such
ordinances must be recommended by the board of public im-
provements. The purpose of the ordinance and the practical
utility or use to the public is to prevent the streets from being
littered, by affording storekeepers and the general public a con-
venient and suitable place to deposit litter, instead of sweeping
it, or throwing it upon the street, thereby making them dirty
and making it necessary for the city to go to the expense of
cleaning them. The city charter requires all ordinances for
cleaning the streets to be recommended by the board of public
improvements, and that course is observed as to cleaning the
streets. But while a sidewalk is a part of a street, the city
does not clean the sidewalks. It requires the abutting prop-
erty owner to do that work. [Rev. Ord. St. Louis, sec. 374,
art. 9, ch. 14.] The city ordinance also makes it a misde-
meanor for any person to deposit dirt or rubbish of any kind
or description upon any street, alley, or public or private high-
way. [Rev. Ord. St. Louis, sec. 375.]

Storekeepers, therefore, will be benefited by this ordinance
by being afforded convenient and suitable receptacles for de-
positing the waste paper and litter that daily accumulate in
their stores. This is itself no small or inconsiderable utility
and saving to them, and therefore the use of the street for this
purpose is a legitimate public use, and the power, under the
city charter is vested solely and exclusively in the assembly,
and the board of public improvements has no control over such

matters or over ordinances authorizing such a use. This ordinance, therefore, does not involve public work, and hence the first objection of the defendants is untenable.

## II.

It is argued that the use of the streets authorized by this ordinance is for a private purpose.

That is, it is claimed that the ordinance authorizes the relator to place advertisements on the boxes, and hence the profit to the relator is the primary purpose of the ordinance, and this being a matter of private gain the use is private and not public.

The same objection can be made, and has been unsuccessfully made, to ordinances granting the use of streets to street car lines, telegraph, telephone, electric light, heat and power lines, gas, water and subway companies, and the like. All such companies are organized for private gain and individuals get, usually, ninety-five per cent (in some cases *all*) of the profits arising from the use of the streets for such purposes. Yet, because they subserve a public use—constitute a public utility—the use has uniformly been held public and not private. The same objection as to advertisements can be made to street car lines, for such companies derive a profit from permitting advertisements to be placed in their cars, and the city gets no part of the profits arising from such advertisements, whereas, here the city gets fifteen per cent of the gross receipts. But the fact that the city gets all, or any proportion, or none of the profits arising from advertisements placed on such receptacles or allowed by street car companies to be placed in their cars, or by telegraph or telephone companies to be placed on their poles, does not in any manner even tend to determine the question of whether the receptacles or street car lines or telegraph or telephone poles are or are not public utilities which make the use of the streets public

and not private. Neither does the question whether the primary and principal purpose of and inducement to the persons granted such franchises is for private gain, and the public profit or advantage is of only an insignificant and secondary nature, afford a fair or determining test to apply to the validity of such an ordinance. For these conditions are present in all cases of public utilities that are furnished by private persons at their own cost. The crucial and final test is, does the use—utility—subserve a public purpose—does it furnish a natural need of the city or its citizens—does it contribute to his comfort, prosperity or happiness? If it does, it is public; otherwise, not. The proportion between the public and the private benefit derived from the use is not a determining factor in the problem. If the public is benefited in any degree the use is public, even though the individual who furnishes the small benefit to the public, may be benefited many times as much as the public. The cases of Matthews v. Alexandria, 68 Mo. 115; Glasgow v. St. Louis, 87 Mo. 678; Cummings v. St. Louis, 90 Mo. 259; Glaessner v. Brewing Association, 100 Mo. 508; Schopp v. St. Louis, 117 Mo. 131, and Coal Co. v. Coal Co., 62 Mo. App. 93, relied upon by the defendants, were all cases where the use of the streets was solely and exclusively for private purposes, and where the public derived not the slightest atom of benefit. Hence, they do not sustain the objection to the validity of this ordinance, but on the contrary illustrate and illumine the differences here pointed out. And when those cases are read in connection with the cases of Julia Building Association v. Bell Telephone Co., 88 Mo. 258; Railroad Co. v. St. Louis, 66 Mo. 228; Porter v. Railroad, 33 Mo. 128, and the multiplicity of cases cited by Judge DILLON (2 Dillon on Mun. Corp., pp. 817 to 894) relating to allowable uses of a street by individuals or private corporations whose primary object is private gain, but which furnish a public utility in some modicum, the conclusion is logically and legally irresistible that this ordi-

nance falls within the latter class of cases, and is a legal exercise of the governmental power conferred by the charter upon the assembly of St. Louis, and that the purpose is public notwithstanding eighty-five per cent of the profit enures to a private person.

It is urged, however, that it would enable the relator to place in front of a merchant's store an advertisement of his rival in business, and hence the ordinance is unfair. This might be a proper argument when made to the assembly against exercising its charter power in considering and adopting the ordinance, but the power being vested in that body, the courts have no right to review it or reverse its conclusions. But the objection at once fades away when the ordinance itself is examined, for section 3 vests the power in the board of public improvements to designate the location of all boxes, and section 4 prohibits the placing of any advertisement on the boxes "until the same shall have first been submitted to and approved by the board of public improvements of said city," and section 7 makes it unlawful to place any such receptacles on any block if a majority of the residents of the block object to it. These appear to be ample answers to the possible injury suggested of having a rival's business advertised in front of one's store.

## III.

There is no merit in the objection that the ordinance is void because it contains more than one subject. The purpose is single. The incidents are germane to the subject. The title expresses the object and the body of the bill carries into effect the object expressed. The title is not a cloak to hide the object intended. The title is not required to be an analytical index to the body of the bill. [Lynch v. Murphy, 119 Mo. 163.]

For these reasons I think the peremptory writ should be awarded. *Sherwood, J.,* concurs in my views.