[No. 22302.   Department One.   June 2, 1930.]

THE STATE OF WASHINGTON, *on the Relation of Allen R. Peter, Appellant,* v. GEORGE P. LISTMAN, *et al., Respondents.*[1]

*John J. Sullivan* and *Thomas E. Geraghty,* for appellant.

*Thomas J. L. Kennedy, A. C. Van Soelen* and *Thos. N. Swale,* for respondents.

[1]Reported in 288 Pac. 913.

MITCHELL, C. J.—This action in mandamus was brought by Allen R. Peter in the superior court to compel the city of Seattle, through its proper officers, to appoint him as patrolman on the police force, and to recover back salary. Upon filing the complaint, a show cause order or alternative writ was issued and served. The defendants, upon appearing in the cause, filed a general demurrer to the complaint. Afterwards an answer was filed, which the relator moved to strike, claiming it was not in time, that it should have been filed with the demurrer.

The denial of the motion to strike is assigned as error. Without deciding whether an answer, if one is made, should be filed at the same time with a demurrer, if one is interposed, in return to a show cause order or alternative writ of mandamus, generally, in the superior court, we are of the opinion the relator is not in a position to urge that question here. After the demurrer was served and filed, the relator took an order with consent of the respondents, who had appeared by demurrer, allowing amendments to the allegations of the complaint and also bringing in another party defendant. Thereafter, without the fixing of another return day or date for trial of the case on its merits, the respondents, including the new party brought in, filed their joint answer stating therein that it was made ''by way of supplemental return to the alternative writ heretofore issued herein.'' This answer was served and filed weeks prior to the trial, and, in our opinion, relator's motion against the answer, because not filed in time, was properly denied. The amendment to the complaint gave the respondents who had already appeared and the new party defendant the right to further plead, and this they did by answer and by way of supplemental return.

The other assignments of error go to the

merits of the case. Generally speaking, it was a matter of common knowledge that, within a short time after Armistice Day, millions of men were discharged from war service and, returning to civil pursuits in this country, found their former positions, particularly in private employment, filled by others who had not been called upon to take part in military or naval service of the United States. One of the effective remedies to meet, in part, this condition of unemployment, was adopted by a number of cities throughout the state and country, including the city of Seattle, of extending preference in public employment, subject to examination, to those honorably discharged who had served this country in time of war. Accordingly, and for that purpose, the voters of Seattle amended their charter, effective March 2, 1920, as follows:

"Preference in employment shall at all times, subject to such examination, be given to citizens of the United States and electors of the city, and to honorably discharged soldiers, sailors and marines of the United States who have served in time of war."

That amendment, of course, relates not solely to those honorably discharged from the service of the United States in the World War. In order to make the purpose of the amendment effective, it further provided a method by way of a list from which appointments should be made, at the head of which list those thus preferred should be placed in the order of their relative excellence among themselves, as shown by examinations.

On March 28, 1920, the appellant, at the age of eighteen years, never having served the United States in time of war, enlisted in the regular army of the United States for the regulation period of three years, and was honorably discharged therefrom on April 14, 1923. In January, 1928, he made application for ap-

pointment as patrolman on the police force, successfully passed examination before the civil service commission, and, it appears, was placed on the preferred list for such appointment. The civil service commission later removed his name from the preferred list and placed it below, deciding that the words "have served in time of war," as applied to the World War, did not include one whose first service was under an enlistment in the regular army after the armistice. The civil service commission gave him written notice of the removal of his name from the preferred list in January, 1929, from which order he did not take any appeal nor demand any hearing.

In January, 1929, there were a number of vacancies in the patrolman department of the police force that were filled without calling the appellant, and it is conceded that he would have been called if his name had not been theretofore taken from the preferred list.

The sole question in the case is what is meant by the words, "have served in time of war," in the charter amendment, as applied to the World War. Appellant contends those words mean, in point of time, down until the ratification of the treaty of peace, while respondents say they do not apply to service commenced after the signing of the armistice. In this respect, words in a given setting and for a particular purpose may mean, and must often be considered to mean, a different thing from what they do in some other setting. What did the people of Seattle mean by this language they used in amending their charter?

The words must be read in a sense which harmonizes with the subject-matter and the general purpose and object of the amendment, consistent of course with the language itself. The words must be understood not as the words of the civil service commission, or the city council, or the mayor, or the city attorney, but

as the words of the voters who adopted the amendment. They are to be understood in the common, popular way, and, in the absence of some strong and convincing reason to the contrary, not found here, they are not entitled to be considered in a technical sense inconsistent with their popular meaning.

The cases relied on and liberally quoted from by the appellant may be noticed. There are excerpts from those cases which seem to support the contentions of the appellant, but, in our opinion, those cases and excerpts are distinguishable from the present case when considered with reference to the particular questions to which they were addressed. First is *Commercial Cable Co. v. Burleson*, 255 Fed. 99. There were two of those suits in equity, brought shortly after the armistice. Plaintiffs were the owners of the marine cables involved, and they prayed injunction against the defendants interfering with the cables. The President of the United States had taken and continued possession of the marine cables in and across the Atlantic ocean as a war measure under a joint resolution of Congress dated July 16, 1918. The resolution authorized the President, during the continuance of the present war, whenever he should deem it necessary for the national safety and defense, to take possession of any marine cables and operate the same for the duration of the war and not beyond the date of the proclamation by the President of the exchange of the ratifications of the treaty of peace. Having in mind the words ''duration of the war'' and during ''continuance of the present war,'' contained in the resolution, plaintiff in those suits contended that, after the armistice was signed, the powers of the President had ended with respect to the matter, and that they were entitled to the possession of the cables. But the court said:

"They rely upon the fact that after November 11, 1918, the war was from a military aspect closed, and that the powers of the President had changed. By virtue of what fact did they change? Not by the intent of Congress, because the resolution expressly extends the powers until peace has been declared. Had they intended that a suspension of hostilities should terminate the right, they would not have said precisely the contrary."

The case of *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U. S. 124, 64 Law Ed. 194, is relied on. That suit was commenced in 1919. The court had under consideration the words "conclusion of the war," referring to the World War, contained in an act of Congress, and the plaintiff in the case contended that those words should be construed as meaning "the time when actual hostilities closed, etc." But the court held against that contention, saying that those words "clearly did not mean cessation of hostilities, because the act was approved ten days after hostilities had ceased upon the signing of the armistice."

Another case relied on by appellants is *Sichofsky v. United States*, 277 Fed. 762. In that case, one was indicted for unlawfully and feloniously entering the United States on August 23, 1920, from a foreign country, through Mexico, without a passport duly vised, as required by an act of Congress of May 22, 1918. It was contended that a public offense was not charged, because the act was a war measure, and that the "war closed on November 11, 1918, and therewith ceased necessity for the law under which the indictment was laid." But the court held that the United States was still technically at war, that is, in substance, that, for the purpose of the indictment, the war was still on, and that, in enacting the law, "Congress exercised not only war powers, but a power inde-

pendent thereof, the power to regulate the entry of aliens into the United States.''

These cases are all illustrative of the general rule that the language of a written law must be read in a sense which harmonizes with the subject-matter and general purpose and object of the law. There is another rule of the same kind mentioned in *Bloomer v. Todd,* 3 Wash. Terr. 599, 19 Pac. 135, 1 L. R. A. 111, that:

''The ordinary use of words at the time when used, and the meaning adopted at that time, is usually the best guide for ascertaining legislative intent, as it is always the intent of any written instrument or law at the time it was made that is to govern in enforcing it.''

Applying these rules to the present case, we are satisfied that the amendment, so far as it related to honorably discharged soldiers, sailors and marines of the World War, contemplated those who had entered the service prior to the signing of the armistice. After the armistice was signed, it was a most common thing to say and to understand that the war had ended. The soldiers, sailors and marines commenced at once to return in large numbers.

The President in his message on November 11, 1918, giving formal and official information to Congress and, at the same time, by that means, speaking to all the people of the United States, after enumerating the thirty-five articles of the armistice that had been signed, immediately said: ''The war thus comes to an end.'' Those words had a popular meaning. Everybody understood them. The war was over, because, as it was further said in that message, ''having accepted the terms of the armistice, it will be impossible for the German command to renew it.''

Still further, this court in *State ex rel. Hart v. Clausen,* 113 Wash. 570, 194 Pac. 793, 13 A. L. R. 580,

in passing on the veterans' equalized compensation act, by a decision filed January 3, 1921, which was prior to both the signing and ratification of the final treaty of peace with the German government, on referring to other cases upon the subject of veterans' compensation from other courts, speaks of them as "cases decided during and since the close of the world war," another indication that it was popular and usual to speak of the war as having closed.

It was in this sense, we are satisfied, that the charter amendment involved in this controversy was adopted. That being the view of the trial court, the judgment appealed from is affirmed.

TOLMAN, BEALS, MILLARD, and PARKER, JJ., concur.