[No. 34082. Department One. July 24, 1958.]

Roy Winkenwerder, *Respondent*, v. The City of Yakima et al., *Appellants*, Republic Publishing Company, *Respondent*.[1]

[1]Reported in 328 P. (2d) 873.

*Arthur Kirschenmann, Robert R. Roberts, Hawkins & Loy,* and *Cheney & Hutcheson,* for appellants.

*Beaulaurier & Hanson,* for respondent Winkenwerder.

*Halverson, Applegate & McDonald,* for respondent Republic Publishing Co.

FINLEY, J.—On July 26, 1955, the city commission of the city of Yakima passed Ordinance No. B-1720, which provided:

"AN ORDINANCE relating to advertising signs on parking meters, and authorizing execution of a contract with the Meter Advertising Company pertaining thereto, and providing for the utilization of the City's share of the revenue therefrom for traffic regulation purposes.

"BE IT ORDAINED BY THE CITY OF YAKIMA:

"Section 1. The Meter Advertising Company, a Washington corporation, is hereby granted permission and directed to place and maintain advertising signs in suitable metal holders affixed to the top of at least 500 parking meters located in the central business district of said city during a six-month period, commencing September 15th, 1955, and thereafter for such additional period, if any, as may be authorized by ordinance or resolution adopted by the Yakima City Commission, in consideration of the sum of $1.00 per parking meter per month for all parking meters upon which said advertising signs are placed, to be paid to said city, and in accordance with the terms and conditions more fully provided in the agreement of even date herewith between said parties, a copy of which is attached hereto and incorporated by reference herein; and the Mayor and City Clerk are hereby authorized and directed to execute said agreement on behalf of said city.

"Section 2. All revenue received by the city therefrom shall be placed by the City Treasurer in the Parking Meter Fund, from which the same shall be expended and utilized solely and exclusively for the payment of a portion of the expense of traffic regulation in said city.

"Section 3. The said Company shall not use any parking meters in said City in such a manner as to prevent, obstruct or interfere with the use thereof for the primary purpose of regulating traffic and parked vehicles.

"Section 4. Nothing herein permitted shall be deemed unlawful or a violation of Ordinance No. A-282, passed on July 25, 1917, or Ordinance No. B-1526, passed on December 31, 1953, as amended, or any other ordinance of said City heretofore passed.

"Section 5. This ordinance shall be in full force and effect thirty days after its passage, approval and publication as provided by law and the City Charter.

"Passed By The City Commission, signed and approved, this 26th day of July, 1955.

"/S/ Gilbert W. Burns
Mayor
"Attest:
"/S/ Pearl Benjamin
City Clerk"

On the same day, the city of Yakima (hereinafter referred to as the city) entered into an agreement with the Meter Advertising Company (hereinafter referred to as the company), which, apparently, owns or holds the rights to an invention—a metallic device for holding advertising signs to be affixed to the top of parking meters. Under the terms of the agreement, the city authorized and directed the company to install and maintain advertising signs in the holders affixed to at least five hundred meters during a six-month trial period; the company agreed to pay one dollar a month for each parking meter so used, and guaranteed the city a minimum of three thousand dollars for the six-month period. It was further agreed that, should the city elect to renew the contract the company would furnish a correct profit and loss statement of the company to the city to be used as a basis for further negotiations. The company agreed not to use any parking meter or meters in such a manner as to prevent, obstruct or interfere with the primary use of the meter for regulation of parking. For clarity, we will quote two of the additional provisions in the agreement:

"6. All advertising charges and all advertising signs used shall be subject to approval by the City Commission as to their nature, size, general appearance and reading matter content, and the same shall be substantially in accordance with the sample thereof previously shown to the City Commission. The signs shall contain no advertising of beer, wine or other intoxicating liquor. The signs shall contain nothing which in the opinion of the Yakima City Commission is of a vulgar, distasteful or obscene nature or offensive to the public. The signs shall contain no religious advertising which in the opinion of the City Commission is of a controversial or sectarian character. The signs shall contain no city political advertising nor any advertising for any can-

.didate for any political office in said city, nor advertisng exclusively for any one political party; but political advertising thereon shall so far as practicable be available in equal amounts to each political party and the candidates thereof. The Company shall to a reasonable extent include without additional charge on said advertising signs, traffic slogans or other similar language encouraging traffic safety and careful automobile operation.

. ":7. No sign advertising the business of a competitor or competing product shall be placed in front of, adjacent to or within a distance of one-half block (on the same side of the street) of a competing business establishment. With reference to a corner establishment, said restriction shall apply for a distance of one-half block on each street from the said corner. The authority and responsibility for determining what is or is not competitive advertising shall be solely that of the City Commission (or a public official, if any, of said City designated by it)."

. Pursuant to the ordinance and the agreement, the company installed the holders and the advertising signs on the top of various parking meters in the city. Thereafter, Roy Winkenwerder initiated a declaratory judgment action seeking to have the ordinance and agreement declared invalid, and an injunction requiring removal of the metal holders and the advertising from the city parking meters. The Republic Publishing Company filed a complaint of intervention, requesting a permanent injunction against the city and the company.

Winkenwerder is a retail hardware and appliance dealer. Republic Publishing Company is engaged in the general printing and publishing business. Both concerns own property abutting on streets where parking meters, with the accompanying metal holders and advertising signs, have been installed. The city and the company demurred to both complaints on the ground that they did not state facts sufficient to constitute a cause of action. The trial court overruled the demurrers and, when the city and the company refused to plead further, entered judgment for the plaintiff and intervener. The judgment declares the ordinance and agreement to be null and void, and the defendants are permanently enjoined "from affixing, permitting the affixing, or main-

taining holders and advertising signs to or upon parking meters in the City of Yakima." The city and company have appealed.

Counsel have stipulated the accuracy of certain pictures showing the parking meters with the advertising holders affixed thereto. These pictures were attached to the complaint and are contained in the record. Rather than to give a detailed description of the metal holders and the signs contained therein, we reproduce below two of the photographs.

Yakima is a city of the first class. With respect to the powers of a city of the first class, we said in *State ex rel. Ennis v. Superior Court* (1929), 153 Wash. 139, 279 Pac. 601:

"It is evident from the constitution of this state and legislative enactments that, in Washington, cities of the first class are vested with very extensive powers, and that, under Rem. Comp. Stat., § 8982, *supra*, the statutes of this state concerning the same must be liberally construed by the courts for the purpose of carrying out the manifest intent of the legislature to establish cities of the first class as self-governing bodies, only 'subject to and controlled by general laws.' "

It is clear from the *Ennis* case and from many other decisions of this court that the only limitation on the power of cities of the first class is that their action cannot contravene any constitutional provision or any legislative enactment. See *State ex rel. Billington v. Sinclair* (1947), 28 Wn. (2d) 575, 183 P. (2d) 813; *State ex rel. Griffiths v. Superior Court* (1934), 177 Wash. 619, 33 P. (2d) 94; *Walker v. Spokane* (1911), 62 Wash. 312, 113 Pac. 775. (*Cf. Washington Fruit & Produce Co. v. Yakima* (1940), 3 Wn. (2d) 152, 100 P. (2d) 8, 103 P. (2d) 1106, 128 A. L. R. 159; and *Brennan v. Seattle* (1929), 151 Wash. 665, 276 Pac. 886, relative to the broad police powers of a city of the first class.) The principles adhered to in the preceding cases clearly indicate that a city of the first class has as broad legislative powers as the state, except when restricted by enactments of the state legislature.

Respondents have not challenged the ordinance and agreement as contravening any state statute. If the state could constitutionally exercise the powers which the city is here attempting to exercise, then the ordinance and agreement are valid, *unless* they contravene some provision of the city's charter.

624

■ "It is, of course, the general rule that every pre-sumption is in favor of the constitutionality of a law or ordinance." (*Spokane v. Coon* (1940), 3 Wn. (2d) 243, 100 P. (2d) 36.) The burden rests upon the party who challenges an ordinance to establish clearly its invalidity; *Ibid.* It is well to keep in mind the words of Justice Holmes in *Noble State Bank v. Haskell* (1910), 219 U. S. 104, 110, 55 L. Ed. 112, 31 S. Ct. 186:

"We must be cautious about pressing the broad words of the Fourteenth Amendment to a drily logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guarantees in the Bill of Rights. They more or less limit the liberty of the individual or they diminish property to a certain extent. We have few scientifically certain criteria of legislation, and as it often is difficult to mark the line where what is called the police power of the States is limited by the Constitution of the United States, judges should be slow to read into the latter a *nolumus mutare* as against the law-making power."

In *Kimmel v. Spokane* (1941), 7 Wn. (2d) 372, 109 P. (2d) 1069, we held that an ordinance providing for the installation and maintenance of parking meters is a valid exercise of a city's police power. It is not disputed that the parking meters are the property of the city.

■ It is generally recognized that a sovereign may lease its property to private parties, so long as there is no interference with the public use. See *Najewitz v. Seattle* (1944), 21 Wn. (2d) 656, 152 P. (2d) 722; *State ex rel. Northern Pac. R. Co. v. Superior Court* (1925), 136 Wash. 87, 238 Pac. 985; *Paine v. Port of Seattle* (1912), 70 Wash. 294, 126 Pac. 628, 127 Pac. 580; 64 C. J. S. Municipal Corporations 282, 283, § 1809; 12 McQuillin, Municipal Corporations (3d. ed.), 665-667, § 35.33. And the Yakima city charter specifically provides, in Art. I, § 1, that the city of Yakima

". . . may acquire property within or without its boundaries for municipal purposes by purchase, gift, devise, lease or condemnation, and may sell, lease, hold, manage and control such property as its interests may require, . . ."

In urging the city's lack of power to lease advertising space on its parking meters, respondents rely principally on the decision of a county court in Pennsylvania (*Chestnut Hill & Mt. Airy Business Men's Ass'n v. Philadelphia* (1954), 87 D. & C. 209), wherein the trial judge stated:

"If the city's position is tenable, it could then divert to private and commercial use all forms of apparatus maintained by the city on sidewalks of private property. Thus, the city's fire plugs, fire alarm boxes, police call boxes, and traffic light standards could be utilized by the city for commercial advertising, if the principle for which defendants are here contending is valid."

A parade of horrible possibilities is not necessarily a sound reason for invalidating an ordinance or a legislative enactment. There is time enough to deal with the possibilities if they become realities. The question we are facing here is the *power* of the city to use its property (parking meters) for advertising purposes. The expediency of such a course of action is a political question. Personal predilections against the seemingly omnipresent advertising men should not lead to placing a constitutional limitation on the sovereign powers of the people in the instant case.

In *State ex rel. York v. Board of County Com'rs* (1947), 28 Wn. (2d) 891, 184 P. (2d) 577, 172 A. L. R. 1001, Judge Steinert gave an excellent analysis and discussion of the power of the state over roadways. We quote at length from that opinion:

"It is true that land dedicated as a highway is thereby devoted to a general, or public, use. . . . [Citing cases.]

"Normally, the interest acquired by the public is but an easement. . . . [Citing cases.] But whatever the nature of the interest may be, it is held in trust for the public, and the primary purpose for which highways and streets are established and maintained is 'for the convenience of public travel.' . . . [Citing cases.]

"In addition to this primary purpose, however, there are numerous other purposes for which the public ways may be used, such as for water mains, gas pipes, telephone and telegraph lines, etc. These are termed secondary uses and are subordinate to, and permissible only when not inconsistent with, the primary object of the highways. . . . [Citing

case.] It is the legal limitation upon these secondary uses which is the subject of our inquiry with respect to appellants' first contention.

"The essential principle to be kept in mind is that the legislature, within constitutional limitations, has absolute control over the highways of the state, both rural and urban. . . . [Citing cases.]

"The legislature has, in practice, traditionally delegated the exercise of this control to counties and municipal corporations, except in the case of primary, and to some extent secondary, state highways." (Italics ours.)

 It is clear from the *York* case, *supra*, that the state has absolute control over the streets—limited only by the constitution. It follows that the state, and thus the city in the case at bar, has the *power* to lease space on its parking meters for advertising purposes, unless the *exercise of that power* contravenes the constitution.

It is contended that the city cannot constitutionally permit and direct the use of the sidewalks, or parking meters thereon, by a private corporation for private gain or profit. Essentially, this argument is that incidental or secondary uses are not constitutional unless they are such as to justify eminent domain proceedings.

In the *York* case, *supra*, Judge Steinert set out five principles, discernible from the decisions of this and other courts, relative to use of the streets and highways. They are:

(1) Streets and highways must be maintained primarily as public ways;

(2) Numerous reasonable incidental uses are permissible without interference from the abutting owner;

(3) The abutting owner has a special interest in the right of way, and he is entitled to compensation for any *unreasonable* encroachment. *Only when the encroachment is unreasonable is there a constitutional taking or damaging, and only then must the interference be justified as for public use;*

(4) Poles and wires for carrying electric current are reasonable incidental uses;

(5) *The limitation on reasonable incidental uses rests with the people, it being a political and not a judicial question.*

Quoting from a previous decision of this court, Judge Steinert continued:

" 'The people of a municipality, who incur and pay the expenses for the construction and maintenance of their streets, and who largely use them, are usually most capable of exercising discretion in the secondary and subordinate purposes for which their streets shall be used.' "

And, in the *York* case, *supra,* the court concluded that

"In our opinion, the rules which we have above summarized do not support appellants' contention that incidental uses of highways *must* be such as justify eminent domain proceedings. They suggest, rather, that the use must have some element of public benefit, and must not be inconsistent with the public use to which the highways are dedicated."

■■ It would appear, therefore, that, even if the particular use authorized by the city is private, it is not unconstitutional on that ground unless the particular encroachment is unreasonable. But we are not prepared to hold, on the basis of the stipulated facts, that the use authorized is not public in nature. We agree with the reasoning of the dissenting opinion in *State ex rel. Belt v. St. Louis* (1901), 161 Mo. 371, 396, 61 S. W. 658:

"It is argued that the use of the streets authorized by this ordinance is for a private purpose.

"That is, it is claimed that the ordinance authorizes the relator to place advertisements on the boxes, and hence the profit to the relator is the primary purpose of the ordinance, and this being a matter of private gain the use is private and not public.

"The same objection can be made, and has been unsuccessfully made, to ordinances granting the use of streets to street car lines, telegraph, telephone, electric light, heat and power lines, gas, water and subway companies, and the like. All such companies are organized for private gain and individuals get, usually, ninety-five per cent (in some cases *all*) of the profits arising from the use of the streets for such purposes. Yet, because they subserve a public use—constitute a public utility—the use has uniformly been held pub-

lic and not private. The same objection as to advertisements can be made to street car lines, for such companies derive a profit from permitting advertisements to be placed in their cars, and the city gets no part of the profits arising from such advertisements, whereas, here the city gets fifteen per cent of the gross receipts. But the fact that the city gets all, or any proportion, or none of the profits arising from advertisements placed on such receptacles or allowed by street car companies to be placed in their cars, or by telegraph or telephone companies to be placed on their poles, does not in any manner even tend to determine the question of whether the receptacles or street car lines or telegraph or telephone poles are or are not public utilities which make the use of the streets public and not private. Neither does the question whether the primary and principal purpose of and inducement to the persons granted such franchises is for private gain, and the public profit or advantage is of only an insignificant and secondary nature, afford a fair or determining test to apply to the validity of such an ordinance. For these conditions are present in all cases of public utilities that are furnished by private persons at their own cost. The crucial and final test is, does the use—utility—subserve a public purpose—does it furnish a natural need of the city or its citizens—does it contribute to his comfort, prosperity or happiness? If it does, it is public; otherwise, not. The proportion between the public and the private benefit derived from the use is not a determining factor in the problem. If the public is benefited in any degree the use is public, even though the individual who furnishes the small benefit to the public, may be benefited many times as much as the public."

In the instant case, the public may benefit in a number of ways by this ordinance. For example, many of the signs advise or warn the public relative to traffic safety; other signs inform the public as to what products are available, and where; the revenue received by the city will lighten the tax load; and the use of the money for traffic regulation will directly benefit the public.

We pass, then, to respondent's next contention—that the use of the sidewalks or parking meters for advertising is an unlawful taking of property without compensation and without due process of law. In his amended complaint, respondent Winkenwerder alleged:

". . . the said metal holders and advertising material located upon the above described real estate materially impair plaintiff's right of free passage and repassage to said real estate, are large and gaudy in appearance, create a wall effect along the curb in front of Plaintiff's place of business, and constitute an unreasonable encroachment materially impairing the view of Plaintiff's place of business by the public and the use of said street and sidewalk as public thoroughfares."

In the light of the stipulated accuracy of the photographs introduced into evidence, we do not believe that the metal holders and advertising signs affixed on the parking meters will create a "wall effect" along the curb, or that they will obstruct or interfere with pedestrian or vehicular traffic. We are unable to conclude that these devices, so pictured, are unreasonable encroachments. We might emphasize for clarity that the reasonableness of a particular encroachment must be determined from the facts peculiar to each case.

Quoting from the *York* case, *supra*, again, we said:

"While there is a divergence of opinion in the cases as to what justifies compensation for an additional burden, it has been persuasively suggested that the line should be drawn at 'unreasonable interference' with the rights of the abutting owner."

See, also, the decision by Justice Holmes in *Noble State Bank v. Haskell*, *supra*, with respect to there being a *constitutional taking* only when there is an unreasonable taking.

The cases cited and relied on by respondent clearly involve unreasonable encroachment.

█ The contention of respondent-intervener with respect to an unlawful taking without due process of law rests upon the fact that the appellants "are acting in direct competition to intervener's business and if permitted to continue, will *dimish* [diminish] intervener's income from advertising sources." (Intervener's complaint.)

In *Hegeman Farms Corp. v. Baldwin* (1934), 293 U. S. 163, 79 L. Ed. 259, 55 S. Ct. 7, the United States supreme court stated:

"The Fourteenth Amendment does not protect a business against the hazards of competition. . . . [Citing case.]

It is from hazards of that order, and not from restraints of law capriciously imposed, that the appellant seeks relief. The refuge from its ills is not in constitutional immunities."

In addition, it would seem that damages to respondent-intervener, "if they exist at all, are entirely conjectural and extremely remote." *Burns v. St. Paul City R. Co.* (1907), 101 Minn. 363, 112 N. W. 412.

On the basis of the record before us, we can find no unlawful taking without compensation or without due process of law.

█ Respondent vigorously contends that the ordinance and concomitant agreement permit the Yakima city commission unlimited discretion in approving the advertising signs as to their nature, size, and general appearance and, as such, constitute an unlawful delegation of discretionary administrative power. This argument hardly merits comment. The "unlawful delegation of discretionary administrative power" rule, by its own terms, applies to *administrative* agencies. The city commission of Yakima is a *legislative* body. In this case there is no delegation of authority whatsoever; the city commission merely *reserved to itself* the right to approve the advertising signs. One city commission could not set up rules governing the approval of the signs, which could not later be changed by a subsequent city commission; therefore, such rules would serve no useful purpose.

The complaints of respondent and intervener respondent indicated other contentions pertaining to unconstitutionality. However, their appellate briefs contain no arguments with respect to such other contentions, and we assume that they have been abandoned.

Finally, respondent relies upon the provisions of Art. XI, §2, of the city charter, which, in pertinent part, reads as follows:

"No franchise or right to occupy or use the streets, highways, bridges, or public places of the city shall be granted, renewed or extended except by ordinance, which ordinance shall be submitted to a vote of the electors of the city at a general or special election and shall not become operative

unless approved by a majority of the electors voting upon said franchise; . . ."

It is contended that the ordinance and the agreement involved the granting of rights under Art. XI, § 2; that the matter was not submitted to a vote of the Yakima electors (as required by Art. XI, § 2), and that the ordinance and agreement are inoperative and invalid.

It is the city's position that Art. XI of the city charter deals only with franchises, as evidenced by its title. The city contends that the phrase, "or right to occupy or use the streets, highways, bridges, or public places of the city," is merely another way of saying "franchise;" and the city contends that this ordinance and agreement do not rise to the dignity of a franchise.

Article XI of the Yakima city charter is entitled, "Franchises." "The word 'franchises' has various significations, both in a legal and popular sense. *The relation in which the term is employed controls its meaning.*" (Italics ours.) 12 McQuillin on Municipal Corporations (3d. ed.), § 34.04, p. 16.

In its broadest sense, the word *franchises* is synonymous with freedom, liberty, rights, privileges, powers, and immunities. See 23 Am. Jur., Franchises, § 2, p. 715. But the word *franchises* has many more limited meanings, depending on its context. See 12 McQuillin, *supra*, §§ 34.01 through 34.09. It must be presumed that the framers of the Yakima charter had a definite purpose for Art. XI, and that they adopted and formulated the various sections in harmony with that purpose.

"That purpose is an implied limitation on the sense of general terms, and a touchstone for the expansion of narrower terms. This intention affords the key to the sense and scope of minor provisions. From this assumption proceeds the general rule that the cardinal purpose or intent of the whole act shall control, and that all the parts be interpreted as subsidiary and harmonious." 2 Horack's Sutherland on Statutory Construction (3d. ed.), § 4704, p. 338.

We believe that we must read the words used in the section under consideration (§ 2) in a sense which harmonizes

their meaning with the subject matter and general purpose of the entire article. See *State ex rel. Peter v. Listman* (1930), 157 Wash. 229, 288 Pac. 913.

We are called upon to construe the word *franchise* and the phrase, "or right to occupy or use the streets, highways, bridges, or public places of the city," as used in Art. XI. As previously pointed out herein, the word *franchise* has many meanings. It is appropriate, therefore, to resort to rules of statutory construction as guides in determining the intent of the framers of the article. We find that, in cases in which the intent is not clear,

" . . . the meaning of doubtful words may be determined by reference to their association with other associated words and phrases. Thus, when two or more words are grouped together, and ordinarily have a similar meaning, but are not equally comprehensive, the general word will be limited and qualified by the special word." 2 Horack's Sutherland on Statutory Construction, *supra*, § 4908, p. 393.

This rule is very helpful in the instant case. We believe that the word *franchise* is limited by the above-quoted phrase which is associated with it in § 2; that the associated phrase indicates the sense in which the framers of the charter were using the word *franchise*. This vitiates respondent's contention that the phrase following the word *franchise* was intended to be broader than the word *franchise*, and a further limitation on the powers of the city commission. But we do not believe that this establishes with sufficient clarity exactly what was intended to be included within the word *franchise* as used in this article. In § 3, we find the following helpful language:

"No franchise shall be granted unless there be inserted therein a provision that the city may acquire *the public utility for the exercise of which the franchise is granted,* . . ." (Italics ours.)

We are convinced that the charter provision, Art. XI, § 2, was intended to place a limitation only on the power of the city commission to grant rights to public utilities or public service companies to furnish service to members of the public generally, through the use or occupancy of

streets, highways, bridges, or public places of the city. See *Washington Fruit & Produce Co. v. Yakima* (1940), 3 Wn. (2d) 152, 100 P. (2d) 8; 12 McQuillin, *supra,* § 34.01, p. 7.

The advertising company is not a public utility in the common understanding of that term. It is our judgment that Art. XI, § 2, of the Yakima city charter did not require that the contract with the advertising company be submitted to a vote of the electorate.

We have found no defect in the substance of or the procedure in adopting the ordinance and concomitant contract; therefore, we conclude that they are valid. The judgment of the trial court should be reversed with directions to dismiss the actions. It is so ordered.

HILL, C. J., WEAVER, and OTT, JJ., concur.

MALLERY, J. (concurring)—The demurrer should have been sustained. The plaintiffs have no right to maintain their action under the declaratory judgment act or at all.

RCW 7.24.020, Rem. Rev. Stat. (Sup.), § 784-2, provides:

"A *person* interested under a deed, will, written contract or other writings constituting a contract, or *whose rights,* status or other legal relations *are affected by a* statute, *municipal ordinance,* contract or franchise, *may have determined any question* of construction or *validity arising under the* instrument, statute, *ordinance,* contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." (Italics mine.)

The key word in the above italicized language is *right.* This court unanimously held in *Kitsap County v. Bremerton,* 46 Wn. (2d) 362, 281 P. (2d) 841, that one attacking the validity of an act must show that its enforcement operates as an infringement on the complaining party's constitutional rights; and without such a showing, the validity of an act cannot be questioned. *De Grief v. Seattle,* 50 Wn. (2d) 1, 297 P. (2d) 940, *Adams v. Walla Walla,* 196 Wash. 268, 82 P. (2d) 584, *Washington Beauty College v. Huse,* 195 Wash. 160, 80 P. (2d) 403.

The city's parking meters are in place, and the right to maintain them is not questioned. The addition of the ad-

vertising matter does not involve a private right of the respondent. He cannot litigate a political matter falling within the charter powers of the city without alleging special damages.

I concur in the result.

December 4, 1958. Petition for rehearing denied.

