[No. 35680. *En Banc.* December 22, 1960.]

THE MUNICIPALITY OF METROPOLITAN SEATTLE, *Respondent*, v. THE CITY OF SEATTLE et al., *Appellants.*[1]

[1]Reported in 357 P. (2d) 863.

*A. C. Van Soelen, A. L. Newbould,* and *Arthur Schramm,* for appellants City of Seattle *et al.*

*Griffith Way,* for appellants Spiro *et al.*

*Nicholas A. Maffeo, pro se.*

*Preston, Thorgrimson & Horowitz, James R. Ellis, Edward Starin,* and *Eugene H. Sage,* for respondent.

OTT, J.—The city councils of Kirkland and Bellevue, on April 21 and 22, 1958, respectively, adopted concurring resolutions for the creation of a metropolitan municipal corporation, as provided by Laws of 1957, chapter 213, p. 804, RCW 35.58. The function of the proposed corporation was limited to the establishment of a sewage disposal service in the city of Seattle and the areas surrounding Lake Washington, including the towns and cities of Bothell, Kirkland, Houghton, Yarrow Point, Hunts Point, Medina, Clyde Hill, Bellevue, Beaux Arts, Renton, and Mercer Island.

The board of commissioners of King county, upon receipt of the resolutions, in accordance with the provisions of the act, gave notice of the hearing to determine the boundaries which would be included in the election notice and referred to in the ballot title for the establishment of the metropolitan municipal corporation. June 10, 1958, the city of Renton, through its council, requested that it be excluded. June 16, 1958, the hearing to fix the proposed boundaries was held.

June 23rd, the commissioners approved the boundaries of the corporation as proposed, which included the city of Renton. September 9, 1958, was set as the date for a special election for the approval or rejection by the electors residing in the area of the formation of the proposed regional metropolitan municipal corporation. In the central city of Seattle, 58,617 voted for the formation and organization of the corporation; 41,703 voted against it. Outside of the central city, 15,693 voted in favor of the proposal, and 7,860 voted against it. Those voting in the city of Renton were 745 for and 1,204 against. The proposal having carried in both the central city and by the combined vote of the outside precincts, as the act provides, the corporation was formed. The metropolitan municipal corporation will hereinafter be referred to as Metro.

April 23, 1959, Metro adopted a comprehensive sewage disposal plan for the region. In order for Metro to carry out the functions of sewage disposal, it was necessary to make arrangements with the central city for the joint use of some of its existing facilities, and to provide for terms upon which the service furnished by Metro would be paid. The comprehensive plan provided, *inter alia,* that the various municipal components of Metro would continue the collection of sewage; that Metro would process and dispose of the effluent after the components' collection service was accomplished; that Metro would pay the central city of Seattle $6,285,660 for the use of some of its existing disposal facilities; that the city would continue to own the facilities and continue to pay the principal and interest on outstanding bonded indebtedness therefor, and that the Metro disposal service charge would be paid by the central city, municipal components, and county residents, upon a certain formula.

When Metro presented the contract to the central city for the use of a part of its disposal facilities, the mayor and city clerk declined to execute it upon the ground that they questioned its validity.

Metro commenced this action against the city of Seattle, in which it sought an adjudication, under the declaratory

judgment act, of the validity of the contract. Melford E. Spiro, a property owner and taxpayer residing within the corporate limits of the city of Seattle, Frank L. Gilbert, an owner of one of the city of Seattle's municipal sewerage revenue bonds 1959, Series 1, and Nicholas A. Maffeo, a property owner, resident, and taxpayer in the city of Renton, were granted leave to intervene as defendants.

The cause was tried to the court. From a judgment entered declaring the contract valid, the defendants have appealed.

The appellants' several assignments of error raise three major questions: (1) The validity of the election procedure for the formation of Metro, (2) the constitutionality of Laws of 1957, chapter 213, p. 804, authorizing the establishment of metropolitan municipal corporations, and (3) the validity of the contract between the city of Seattle and Metro, and the rights of the bondholders to whom certain sewage disposal revenues were previously pledged, in the event the contract should become effective.

(1) Was the election procedure for the formation of Metro valid?

The appellants' sole objection to the election procedure is that the special election ballot erroneously stated that the resolution establishing the boundaries of Metro had been adopted by the county commissioners on June 16, 1958, when, in fact, the resolution was adopted June 23, 1958.

Laws of 1957, chapter 213, § 9, p. 809, RCW 35.58.090, provides in part as follows:

" . . . The ballot proposition shall be in substantially the following form:

" 'FORMATION OF METROPOLITAN MUNICIPAL CORPORATION

" 'Shall a metropolitan municipal corporation be established for the area described in a resolution of the board of commissioners of ........................................ county adopted on the ........................ day of ................................, 19........, to perform the metropolitan functions of ................................ (here insert the title of each of the functions to be authorized as set forth in the petition or initial resolution).

YES ................................. □  
No ................................. □' "

The suggested statutory form was followed precisely. The appellants do not assert that the boundaries were irregularly approved by the commissioners of King county, or that the description of the boundaries in the resolution and election notices was not identical. They contend that the voters were misled by the ballot title which stated that the boundaries were approved June 16th, when, in fact, they were not approved until June 23rd.

■ A ballot title must apprise a voter of the proposal being considered. In the ballot form quoted above, the legislature did not require that the proposed boundaries be set out by a metes and bounds description, but provided that the ballot title refer only to the commissioners' resolution which fixed the boundaries of the area for the purposes of the special election. A voter concerned only with the boundaries being considered is apprised of them by the election notice to which he responds in the exercise of his right of franchise. It is the resolution of the commissioners which fixes the boundaries to be voted upon. The date establishes only the day when the resolution was adopted. In the instant case, the irregularity in the ballot title as to the date when the boundaries were, in fact, approved by the commissioners was a minor one.

We have held that minor irregularities in the wording of a ballot title will not invalidate the election, if the electorate was not misled thereby. See *State ex rel. Wright v. School Districts Nos. 45 and 13 of Kitsap County,* 165 Wash. 440, 5 P. (2d) 1009 (1931), and cases cited therein; 3 McQuillin, Municipal Corporations (3d ed.), 98, § 12.14. We do not believe that any voter was misled by this irregularity in the ballot title and, therefore, find no merit in this contention.

(2) Is chapter 213, Laws of 1957, *supra,* an unconstitutional statute?

■ The appellants contend that the law creating Metro is a special, rather than a general, law because it is applicable only to the Lake Washington drainage basin, and, therefore, is in contravention of Art. II, § 28, and Art. XI, § 10, of our state constitution, which sections are directed

against the enactment of legislation which favors one particular person, group or area to the exclusion of others. *State ex rel. Collier v. Yelle,* 9 Wn. (2d) 317, 115 P. (2d) 373 (1941); *State ex rel. Hunt v. Tausick,* 64 Wash. 69, 116 Pac. 651 (1911).

The legislature declared its policy in regard to the passage of the act as follows:

"It is hereby declared to be the public policy of the state of Washington to provide for the people of the populous metropolitan areas in the state the means of obtaining essential services not adequately provided by existing agencies of local government. The growth of urban population and the movement of people into suburban areas has created problems of sewage and garbage disposal, water supply, transportation, planning, parks and parkways which extend beyond the boundaries of cities, counties and special districts. For reasons of topography, location and movement of population, and land conditions and development, one or more of these problems cannot be adequately met by the individual cities, counties and districts of many metropolitan areas.

"It is the purpose of this act to enable cities and counties to act jointly to meet these common problems in order that the proper growth and development of the metropolitan areas of the state may be assured and the health and welfare of the people residing therein may be secured." Laws of 1957, chapter 213, § 1, p. 804, RCW 35.58.010.

Laws of 1957, chapter 213, § 3, p. 805, RCW 35.58.030, provides:

"Any area of the state containing two or more cities, at least one of which is a city of the first class, may organize as a metropolitan municipal corporation for the performance of certain functions, as provided in this act."

Since the benefits of the act encompass numerous areas of the state which may elect to qualify under it, it is apparent that the act does not come within the purview of the cited constitutional provisions.

It is contended (1) that Metro has been given the power to tax, in contravention of Art. XI, § 12, of the state constitution, and (2) that, as to the citizens of Renton, the act provides for taxation without representation, which is

violative of the fourteenth amendment to the United States Constitution and Art. I, § 3, of the state constitution.

■ With reference to the first of these contentions, Art. XI, § 12, of the state constitution, provides:

"The legislature shall have no power to impose taxes upon counties, cities, towns or other municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof, the power to assess and collect taxes for such purposes."

The quoted section is a limitation upon the legislature's power to tax. The legislature has not, by the enactment of chapter 213, Laws of 1957, *supra*, imposed a tax. It has provided a means by which a regional municipal corporation can be formed. When the electorate votes to establish it, it acquiesces in the imposition of the tax which is necessary to carry out the purposes of the act. It is the corporation, and not the legislature, which imposes the tax. What we said in *Northern Pac. R. Co. v. Pierce County*, 51 Wash. 12, 17, 97 Pac. 1099 (1908), is apropos here:

" . . . This is an organization voluntarily entered into under powers, regulations and forms prescribed by the legislature, and the burden of paying the expenses necessary to effectuate the object of the organization was voluntarily assumed by a vote of the people. As we said in *State ex rel. Seattle v. Carson*, 6 Wash. 250, 33 Pac. 428: 'So long, therefore, as the tax is imposed by the corporate authorities, the evil sought to be avoided by the constitutional provisions is not incurred.' In this case the burden being self-imposed, there is no room to exclaim against legislative power."

■ Relative to (2), appellant Maffeo contends that Metro is empowered to impose real property taxes upon the taxpayers of the city of Renton. The appointed governing board of Metro, consisting of fifteen members who are elected officials in the area, is not entirely elected by the people of Renton. Maffeo asserts that any tax Metro imposes is taxation without representation and, therefore, a deprivation of property without due process.

Laws of 1957, chapter 213, § 12, p. 813, RCW 35.58.120, provides in part:

"A metropolitan municipal corporation shall be governed by a metropolitan council composed of the following: . . .

"(4) One member from each of the three largest component cities containing a population of ten thousand or more other than the central city, selected by, and from, the mayor and city council of each of such cities. . . ."

Through the democratic processes of the ballot, Renton has become a part of a regional area for the purpose of sewage disposal. The governing body is the Metro council, as ordained by the electorate residing within the newly formed regional municipality. Renton is one of the cities which will be represented on the Metro council by its mayor or one of its councilmen. In the instant case, the appointments to the council are made from the ranks of elected officers residing within the region, all of whom are directly responsible to their constituents. RCW 35.58.120, *supra.* The representation provided by the act is consistent with the representative form of government which the constitution demands.

■ Appellants next contend that the legislature is proscribed from establishing an entity with the authority to exercise the police power, by Art. XI, § 11, state constitution, which provides:

"Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws."

The appellants take the position that, by applying the rule of construction that the expression of one subject implies the exclusion of others, the only subdivisions of the state which may exercise the police power on these subjects are those specifically enumerated in Art. XI, § 11. We do not agree for two reasons:

First, Art. XI, §11, provides that the political bodies named therein may exercise this phase of the police power only so long as their actions are not in conflict with the general laws. The proposition that the police power originates

and inheres in the state is fundamental. Had the state undertaken to correct the problems which the Metro act is designed to remedy on a regional level, it is beyond question that these political subdivisions would have had to yield. Instead, the legislature, in the exercise of its police power, chose to provide the machinery whereby these problems might be remedied on a local level. Because the Metro act is a general law enacted by the legislature, and a valid exercise of the *state's* police power, we hold that the act is not repugnant to Art. XI, § 11.

Secondly, no part of Art. XI purports to divest the legislature of any of its inherent police power or to limit it. Art. XI is entitled "COUNTY, CITY AND TOWNSHIP ORGANIZATION." It provides the means for the establishment of municipal corporations, and the extent to which they may govern themselves. In no particular is the legislature limited in acting for the common good of all, when a situation arises which calls for an exercise of the police power by the state. A reading of the various sections of Art. XI makes it clear that its framers never intended to diminish the police power of the legislature. See *Paine v. Port of Seattle*, 70 Wash. 294, 126 Pac. 628, 127 Pac. 580 (1912). Art. XI, § 9, provides that counties may not discharge their inhabitants or property therein from taxes levied for state purposes. Art. XI, § 10, provides that, after incorporation, municipalities "shall be subject to, and controlled by general laws." Art. XI, § 11, *supra*, provides that the municipalities mentioned therein "may make and enforce . . . sanitary and other regulations as are not in conflict with general laws." The basic premise urged by the appellants is not that the Metro act transcends the state's police power, but that Art. XI, § 11, limits its exercise.

For the reasons stated above, we find that chapter 213, Laws of 1957, *supra*, is within the police power of the state, and that the legislature is not limited by any constitutional mandate contained in Art. XI.

█ It is contended that two municipalities may not exercise the same phase of the police power concurrently in the same area. This concept of overlapping of phases of

the police power has long been with us. Law enforcement, fire protection, and health protection, all of which are carried on at the city, county, and state levels, in many instances territorially overlap and readily demonstrate this. The same question was raised in *Paine v. Port of Seattle, supra,* where we said (p. 306):

" . . . We conclude that the law is not unconstitutional because by its terms it gives to a port district some of the powers and authorizes it to make expenditures and incur indebtedness for some of the things for which a county and city may make expenditures and incur indebtedness. . . ."

See, also, *Bayha v. Public Utility Dist. No. 1 of Grays Harbor County,* 2 Wn. (2d) 85, 97 P. (2d) 614 (1939); *Royer v. Public Utility Dist. No. 1 of Benton County,* 186 Wash. 142, 56 P. (2d) 1302 (1936).

We adhere to the law announced in the *Paine* case, and find no merit in this contention.

■ The appellants' next contention is that the method provided for establishing Metro's boundaries constitutes an unlawful delegation of legislative power, in contravention of Art. II, § 1, of the state constitution. Section 7 of the act (RCW 35.58.070) provides, *inter alia,* that, by a concurring resolution, the city councils of two or more component cities may call for an election, the resolution to describe the boundaries of the proposed metropolitan area. Section 8 (RCW 35.58.080) provides for a notice and hearing on the resolution, and that the notice contain a description of the proposed boundaries.

The only function of the commissioners at the hearing is to determine that the petitioners' proposed boundary lines encompass all of the area in the region which contributes to the problem sought to be corrected. After all interested persons have had an opportunity to be heard, an election is held. It is the vote of the people, not the board of county commissioners, that fixes the boundaries.

The rule announced in *Port of Tacoma v. Parosa,* 52 Wn. (2d) 181, 324 P. (2d) 438 (1958), is apropos here. We there approved a similar method for fixing the boundaries of a

port district, and held that such a method was not an unlawful delegation of legislative power, stating (p. 192):

" . . . The proposal of boundaries by petitioners is no exercise of legislative power. No law is made thereby. It is only when the proposed boundaries have been accepted by a majority vote of those concerned that they become fixed, and such action is in accord with the principles of local self-government."

■ Appellants state that "Properly constituted cities and towns, endowed by the Constitution with their own powers of local self-government are thus helpless before the mass of electors in the entire proposed area."

This contention has no merit for two reasons. First, the legislature has authorized the creation of a new municipal regional corporation, of which counties and cities become component parts. It is the voters residing within the proposed regional area, and not the municipalities in which the voters reside, who determine whether the proposed boundaries will be accepted or rejected.

Secondly, the legislature has prevented the mass of the electors from imposing its will upon the minority by providing that the acceptance of the proposal must be by both the electors of the central city as one group, and by those outside the central city as another group. Failure to accept the boundaries by either group would defeat the proposal. The method by which the boundaries are to be determined is a political question, not a judicial one. *Port of Tacoma v. Parosa, supra.*

■ The final argument raised in relation to whether or not the act violates Art. II, § 1, is that the legislature has provided no minimum standards by which the county commissioners are to measure pollution or nonpollution prior to bringing Renton within the proposed boundaries of Metro. Section 8 of the act (RCW 35.58.080) provides in part:

" . . . The commissioners may make such changes in the boundaries of the metropolitan area as they shall deem reasonable and proper, but . . . may not delete any portion of the proposed area which is contributing or may

reasonably be expected to contribute to the pollution of any water course or body of water in the proposed area . . . "

The standard upon which the commissioners based their action, namely, that Renton was contributing or could reasonably be expected to contribute to the pollution problem, was broad. This court has approved standards which are equally as broad. The standard provided in the instant act is not contrary to our prior decisions. In *State ex rel. Washington Toll Bridge Authority v. Yelle*, 195 Wash. 636, 82 P. (2d) 120 (1938), we sustained the authority of the Washington toll bridge authority to provide for the establishment and construction of toll bridges " 'wherever the same is considered necessary or advantageous.' " In this regard, each legislative enactment must necessarily stand or fall on its own provisions. In the instant act, the legislature has provided an adequate standard to guide the board of county commissioners in its determination of the area to be served. The appellant Maffeo does not contend that there were any irregularities in the hearing before the commissioners, or that the commissioners failed to be guided by the standards which the legislature did establish. Thus, we find no merit in this contention.

■. Appellants next contend that the agreement is void, in that it permits the city of Seattle to exceed its constitutional debt limit, in violation of amendment 27, state constitution. The appellants state that the sewage disposal charge to be paid is not, in substance, a service charge, but, rather, is a means of constructing additional facilities, thereby technically creating a debt on the city of Seattle, and that "The City is in form the guarantor of Metro's debts but in truth itself the debtor."

Section 5, subd. 6, of the contract between the central city and Metro provides:

"The City irrevocably obligates and binds itself to pay its sewage disposal charge out of the gross revenues of the Sewerage Utility created by Ordinance No. 84390. The City further binds itself to establish, maintain and collect City sewerage charges sufficient to pay all costs of maintenance

and operation of the City Sewerage Utility, including the sewage disposal charge payable to Metro hereunder and sufficient to pay the principal of and interest on any revenue bonds of the City which shall constitute a charge upon such gross revenues. It is recognized by Metro and the City that the sewage disposal charge paid by the City to Metro shall constitute an expense of maintenance and operation of the City Sewerage Utility and that the City shall have the right to fix its own schedule of sewerage rates and charges, provided that same shall produce revenue sufficient to meet the covenants contained in this agreement."

Obligations payable from a special fund and solely from anticipated service revenue do not constitute a debt within the meaning of the constitutional debt limitation provisions. *Gruen v. State Tax Comm.*, 35 Wn. (2d) 1, 211 P. (2d) 651 (1949).

We find no merit in any of appellants' contentions that the act is violative of the constitution.

(3) We now pass to the consideration of the issue raised relative to the validity of the contract, and the rights of the bondholders.

■ Appellants contend that the city is without power to pledge city revenues to Metro in payment of the sewage disposal service furnished by it because there is no express or implied power or authority in the city's charter, or by statute, granting the city the right to pledge the gross revenue of its sewage utility to pay for the disposal service. No section of the charter of the city of Seattle prohibiting this action has been called to our attention. RCW 35.21.210 provides:

"Any city or town shall have power to provide for the sewerage, drainage and water supply thereof, and to establish, construct and maintain a system or systems of sewers and drains and a system or systems of water supply, within or without the corporate limits of such city or town, and to control, regulate and manage the same."

The statute grants to cities and towns the power to provide for a system of sewers within and without their corporate limits, and to control, regulate, and manage the

same. It must follow that with the power to provide a sewer system there is implied the power to pay for it, unless otherwise prohibited by the charter or statute. *Winkenwerder v. Yakima,* 52 Wn. (2d) 617, 328 P. (2d) 873 (1958).

■ The appellants next contend that the term of fifty years specified in the contract is an unreasonable term. Whether or not the contract term is unreasonable is a question of fact. The court entered no factual findings and, in our appellate review, we do not determine factual issues. *Gilbert v. Rogers,* 56 Wn. (2d) 185, 351 P. (2d) 535 (1960). In the absence of an affirmative showing of unreasonableness, the contract is *prima facie* valid. *Washington Fruit & Produce Co. v. Yakima,* 3 Wn. (2d) 152, 100 P. (2d) 8, 103 P. (2d) 1106, 128 A. L. R. 159 (1940).

Applying these rules to the instant case, we hold that the presumption of the reasonableness of the term has not been overcome.

■ Appellants next contend that the Seattle-Metro contract violates the city's plan and system ordinance which created the system as a utility, and that the contract impairs the obligation created by the issuance of the bonds.

Ordinance No. 89363 authorized the city to contract with Metro. Ordinance No. 84390 authorized the city's sewage system as a utility, and fixed the rates to be charged the various recipients of the service. Ordinance No. 87653 adopted a plan or system of additions, betterments or extensions to the existing municipal sewer system, and provided for the issuance of Seattle municipal sewerage revenue bonds of 1959 in the aggregate amount of eighteen million dollars, to be issued from time to time as the city council authorized by resolution. The first bond issue under the ordinance was in the amount of seven million dollars (Series No. 1). The appellants argue that by § 7 of ordinance No. 87653 the city agreed "not to sell, lease or in any manner dispose of its municipal sewerage system . . . until all obligations outstanding against or payable from said special fund . . . shall have been paid in full." The ordinance and the contract provide that title

to the city's disposal facilities is to remain in the city. The record does not indicate that there has been any violation of the city's plan and system ordinance creating the system as a utility. The plan and system adopted by ordinance No. 87653 are the same plan and system which were adopted by Metro as a part of its comprehensive plan.

With reference to the second contention that the security of owners of 1959 Series 1 bonds has been impaired, the record discloses that $6,285,660 are to be paid by Metro to the city for the privilege of using the city's facilities. Whether the sum will be deposited in the special fund to pay the interest and principal of the outstanding bonds is not apparent from the record. In any event, the prospective bondholders of the issue provided by ordinance No. 87653 were fully apprised of the possibility of the creation of the metropolitan municipal corporation in the prospectus published by the city relative to the possible acquisition by Metro of the disposal feature of the sewage problem. The prospectus indicated several methods by which the owners of the bonds would be reimbursed, and concluded with the statement that

"Irrespective of the method of reimbursement adopted, the Engineers believe that the investors' interests will be adequately protected in case Metro should acquire some of the facilities being constructed with proceeds from the presently proposed bond issue."

When the voters adopted the Metro plan to accomplish the purpose of sewage disposal, and Metro thereafter contracted with the city for the use of some of its sewage disposal facilities, the city, by its agreement with Metro, could not impair its obligation to pay the bonds out of the revenues it receives from the sewage charge imposed and collected pursuant to the ordinance. In this regard, § 9 of the city's contract with Metro provides in part as follows:

" . . . The City shall continue to own the facilities described in this Section 9 and shall continue to pay the principal of and interest on any bonds issued to pay in whole or in part the cost of acquisition and construction of such

facilities, provided that facilities which are designated as 'permanent' shall be conveyed by the City to Metro by quit claim deed upon payment of all presently outstanding revenue bonds or general obligation bonds of the City secured by or issued to acquire or construct said facilities."

The bondholders continue to have an unimpaired and first lien upon the revenue received from the fund created by the ordinance, and that portion of § 5 of the contract in which the city irrevocably obligates and binds itself to pay its sewage disposal charge out of the gross revenues of the sewage utility created by ordinance No. 84390 is subservient to the prior claim of the bondholders. Nor does the record indicate that there has been a sale, lease or disposal of the city's facilities, in contravention of the rights of the bondholders.

For the reasons stated above, the judgment is affirmed. All parties, by a stipulation in writing, have agreed to bear their own costs.

WEAVER, C. J., MALLERY, HILL, FINLEY, ROSELLINI, FOSTER, and HUNTER, JJ., concur.

DONWORTH, J., did not participate.